UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Citicasters Co., <br> d/b/a WSPD, Radio 1370, et al., <br><br> Plaintiffs, <br><br> -vs- <br><br> Carleton Finkbeiner, in his official capacity as Mayor of the City of Toledo, et al., <br><br> Defendants. | ) Case No. 07-CV-00117 <br> ) <br> ) Judge James G. Carr <br> ) <br> ) **PERMANENT INJUNCTION ORDER** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

\* \* \*

This cause came on for hearing and was heard on the 31st day of January, 2007 before the Honorable James G. Carr upon motion of Plaintiffs for a Permanent Injunction restraining Defendants, and their agents and those other persons acting in concert or participation with them from engaging in certain unlawful activities. The Temporary Restraining Order issued January 16, 2007 is merged into this Order. Page references herein are to the official transcript of that TRO hearing.

### I. UNDERLYING FACTS

At the Court's January 16, 2007 hearing on Plaintiffs' Motion for Temporary Restraining Order, it was established that Defendant City of Toledo, through Defendant Carleton Finkbeiner, its Mayor, and his Public Information Officer, Defendant Brian Schwartz, each acting in their official capacities, had refused to provide WSPD Radio 1370, a Clear Channel

SLK_TOL: #1180516v1

radio station owed by Citicasters Co., with advance notice of the Defendants' public news conferences since June, 2006. Defendants during the week prior to the hearing had begun to notify a WSPD Radio reporter of scheduled news conferences, but refused to so notify WSPD's News Director, Cassie Wilson (see Appendix 1 to Verified Complaint).

It was further established at that hearing that on January 9, 2007, pursuant to Defendants' policies, Plaintiff Kevin Milliken, an employee of WSPD Radio 1370, was denied entrance by Defendants to the Mayor's public press conference regarding the City's Martin Luther King, Jr. Day program (Verified Complaint, paragraph 20). On January 10, 2007, when Plaintiff Milliken managed to enter the Defendant Mayor's public press conference room despite Defendants' attempts to deny him entrance from a scheduled public press conference, the Mayor cancelled the press conference and instead met individually with selected members of the media, again excluding Plaintiff Milliken.

## II. DISCUSSION OF THE ISSUES

At the January 16, 2007 hearing, the Court questioned counsel for the parties to clarify the factual history and legal issues before the Court.

Counsel for the Defendants asserted (pages 4-5) that Defendants had excluded Plaintiff Milliken from attending their public press conference in their belief that "he was not a reporter ... [but rather] an entertainer ... for talk show radio." Counsel for Defendants did not respond to the Court's inquiry whether there is any distinction in the law between a talk show and newscast, asking for additional time to research the topic.

Counsel for the Defendants asserted that a public official could hold press "briefings" and then selectively "invite" only some media members, or give a "scoop" to an individual reporter, (pages 5-6), but acknowledged that in this case the complaint alleged that

Mr. Milliken had been barred by public officials from public news conferences on public property to which he had previously been routinely admitted.

Counsel for the Defendants represented that the City and Defendant Mayor would allow Mr. Milliken to attend further public news conferences (page 7) but the Court expressed concern whether such press conferences might again be changed to "briefings" from which Mr. Milliken would be excluded while other members of the press would be admitted. *Id.* The Court sought to avoid "semantic hair splitting" about a briefing versus a news conference in the future. Counsel for the Defendants acknowledged that Mr. Milliken was the only member of the press excluded from the prior press conference (page 8).

Counsel for Plaintiffs stated that they had outlined their two requests to the City Law Director in a two-page letter January 12, 2007 but had received no notice of any concession by the City before entering the courtroom January 16, 2007 for the hearing (page 9). Counsel for Plaintiffs described the two elements in their Complaint. First, as Appendix 1 to the Complaint stated, Defendant Schwartz only began to give notice of scheduled news conferences to a WSPD Radio reporter the past week, and then only to one of its reporters, refusing to provide notice to the station News Director, Mr. Schwartz stating that he would "notify who I choose to notify about press conferences. If I choose to notify [the reporter], you'll have to live with it." See Verified Complaint, Appendix 1. Plaintiffs sought timely advance notice from the City of scheduled press conferences.

Secondly, Plaintiffs sought an order requiring the Defendants to admit Mr. Milliken to all public press conferences. Counsel for Defendants admitted (page 11) that any member of the public may attend its press conferences. Page 11. Plaintiffs argued that the Mayor's policy prohibiting Mr. Milliken from attending past press conferences is a situation

which may readily recur and invades his free speech right to gather the news, constituting state action under color of law, impairing his First Amendment rights and being presumptively unconstitutional, under 42 U.S.C.A. §1983 (page 11).

The Court confirmed that there had been some past conflicts of opinion between the mayor and Mr. Milliken, but there was no contention by the City that Mr. Milliken or any other representative of that station had acted in an excessively disruptive or otherwise inappropriate manner (page 12).

The Court observed that it seemed excessive to permit a public official, who had excluded a member of the press from attending and who had also unilaterally declined to notify a media outlet, to be given an entirely free hand in the future to decide who is allowed to attend public press conferences (page 13-14). The Court recognized that a public official may contact someone in the media and offer information only to that person, in what would be called a "briefing," but if a public official has what in Washington, D.C. is called the "gaggle" in for a meeting, that is a press conference. The City's excessive or exclusive focus on the idea of a briefing was "troublesome" to the Court (page 14). In light of the allegations of the Verified Complaint, the Court was concerned that somehow every future media opportunity of Defendant would be labeled a "briefing" necessitating future court hearings (page 15).

Counsel for the parties discussed certain cases, including *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006) which the Court found to be "entirely distinguishable" because it involved excluding a reporter from a "briefing" not a public news conference (page 18). Counsel for Plaintiffs presented a more recent 4th Circuit decision, *Blankenship v. Manchin*, 2006 U.S. LEXIS 31339 (4th Cir. Dec. 20, 2006) in which enough retaliation was shown that a preliminary injunction was granted (page 19-20). Plaintiffs also argued that in *The Times-*

*Picayune Publishing Corp. v. Lee*, 1988 U.S. Dist. LEXIS 3506 (E.D. La. April 15, 1988) an injunction was issued to require the Sheriff of Jefferson County, La. to notify a newspaper of press conferences in advance, (page 16), and Plaintiffs relied on other cases in their Motion For Temporary Restraining Order and Memorandum In Support.

Upon these arguments of counsel for the parties, the Court found (page 20) a strong likelihood of success on the underlying merits with regard to the Defendants' unilateral refusal to notify an established media outlet that press conferences are going to be held is a violation of the First Amendment. In this case, as a variation on that, by bypassing the news director and insisting on only allowing a specific chosen designee of Defendants-public officials to attend, the Court found the Defendants violated the First Amendment. It appeared to the Court to be "an effort to manage the news by manipulating who comes to hear what's to be said and therefore who reports it." In the Court's view, the "flip side of that, namely barring the media representative selected by the station without apparent cause to do so ... would also violate the First Amendment. A press conference is a public event. And to pick and choose who can attend seems to me clearly to violate the First Amendment" (page 20).

Thus the Court found a strong likelihood of success on the merits as to those contentions (page 21), and then next examined the third criterion, whether issuing the requested injunction would cause substantial harm to the Defendants, and counsel for Defendants acknowledged that no harm would result by issuing the temporary restraining order (page 21).

The Court then examined the fourth criterion, whether the public interest would be served by issuance of an injunction and observed (pages 21-22):

> "If not the most fundamental right the citizenry enjoys, it is among the most fundamental, and namely, the right to be informed to a day and age, for better or for worse, whatever information the public gets comes from the broadcast media. ... the press is

> allowed to attend with recording devices and so forth, cameras and so forth. ... A benefit to the public that is gained by the attendance of the broadcast media is it gets to hear and/or see, in any event witness firsthand what the public official is saying, what questions are being asked, what responses are given. It is not even the filtration that might otherwise occur through the reporter who then relates what he or she saw and heard. The public hears firsthand, or at least there's the opportunity to hear firsthand. There is, of course, the filtration that occurs in terms of what is broadcast, but nonetheless, in a unique way the ability of the broadcast media to attend offers an enhanced opportunity for the public to be informed. And curtailment of that opportunity can distinctly and adversely diminish the public's ability to be informed. So it seems to me that the public interest would be well served by issuance of the restraining order."

The Court finally considered the issue of irreparability of harm (page 22) and asked how counsel for Defendants could assure the Court, in light of the Defendants' past actions, how the door for some members of the media might not be closed again in the future (page 23).

The Court observed, when counsel for the Defendants expressed concern that an Order would be "a sword of Damocles hanging over [their clients' head]" (page 24) that "the purpose of a restraining order is to make clear to a public official that you disregard the First Amendment at your risk and peril. That's the whole point. And maybe it's not such a bad thing ... to the extent that there might be some restraint on the part of any public official developing that kind of relationship with members of the press to the exclusion of others, I happen to think that's not all bad. More sunshine, more disinfectant, more light, more knowledge, a better informed public. That's a risk that I think is well worth imposing." (Pages 24-25).

The Court found that it "would defeat the whole purpose which brings the Plaintiffs here, which is to insure to the maximum extent possible equivalence of access to public officials when they decide to speak to the public on their behalf or on behalf of the City. That's

what a free press is all about." (Page 25). Counsel for Plaintiffs confirmed to the Court that they will seek attorneys' fees under 42 U.S.C.A. §1988.

The Court thereupon issued a Temporary Restraining Order January 16, 2007 and set the matter for hearing upon a preliminary and permanent injunction on January 26, 2007.

### III. <u>PERMANENT INJUNCTION</u>

The Defendants hereto, through their duly authorized legal counsel, hereby consent that they, their officers, agents, employees and other persons acting in concert or participation with them, under penalty of contempt, shall

(1) admit Plaintiff Kevin Milliken to the Defendants' public press conferences, and

(2) give advance notice to the News Director of Plaintiff WSPD 1370 Radio equivalent to that given to other news organizations of Defendants' public press conferences.

*/s/ Thomas G. Pletz*
Thomas G. Pletz
Shumaker, Loop & Kendrick, LLP
**Attorneys for Plaintiff**

*/s/ William H. Bracy*
William H. Bracy
City of Toledo Law Department
**Attorneys for Defendants**

**IT IS SO ORDERED:**

/s/ James G. Carr
James G. Carr, Chief Judge